**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **KIMBERLY TROUTMAN** | ) | |
| **(f/k/a KIMBERLY WALKER)**, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | CIVIL ACTION FILE |
| v. | ) | NO._____ |
| | ) | |
| **CURRICULUM ASSOCIATES LLC** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| *Defendant*. | ) | |

## COMPLAINT

Plaintiff Kimberly Troutman (f/k/a Kimberly Walker) ("Plaintiff") sets forth the following Complaint for damages against Defendant Curriculum Associates LLC ("CA" or "Defendant").

## INTRODUCTION

1. This action is for ADA discrimination and retaliation as well as FMLA retaliation arising under the Americans with Disabilities Act of 1990 ("ADA") as amended, Title VII of the Civil Rights Act of 1964 as amended by the Pregnancy Discrimination Act of 1978 ("Title VII"), the Pregnant Workers Fairness Act ("PWFA"), and the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"). Plaintiff seeks declaratory and injunctive relief, back pay, front pay, compensatory damages, punitive damages, liquidated damages and attorney's fees and costs.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the present matter pursuant to 28 U.S.C. § 1331.

3.      Venue is appropriate in this Court as, upon information and belief, the events complained of herein occurred within the geographic boundaries of the U.S. District Court for the Northern District of Georgia, and upon information and belief, all parties to this action reside within the geographic boundaries of the United States District Court for the Northern District of Georgia. Venue is proper pursuant to 28 U.S.C. § 1391 (b) and (c).

## PARTIES

4.      Plaintiff is a former employee of Defendant.

5.      Defendant is a foreign limited liability company registered to conduct business in the state of Georgia.

6.      Defendant may be served through its registered agent if service of process is not waived:

Registered Agent Name: **Corporation Service Company**
Physical Address: **2 SUN COURT, SUITE 400, PEACHTREE CORNERS, GA, 30092, USA**
County: **Gwinnett**

7.      This Court has personal jurisdiction over Defendant.

## ADMINISTRATIVE PROCEEDINGS

8.    On January 11, 2023, Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Defendant.

9.    On April 2, 2024, the EEOC issued Plaintiff her notice of right to sue.

10.    Plaintiff has exhausted her administrative remedies prerequisite to the filing this suit.

11.    Suit has been filed within 90 days of Plaintiff's receipt of her notice of right to sue.

## STATEMENT OF FACTS

12.    CA partners with educators to develop instructional and diagnostic solutions.

13.    CA is an employer within the meaning of the ADA, Title VII, and the FMLA.

14.    Plaintiff was hired on or about April 22, 2019, as a Professional Development Specialist.

15.    Plaintiff was responsible for providing targeted professional development, in-classroom support, data analysis, daily project management, and communication with CA's customers.

16.    Plaintiff was a good employee with no disciplinary or other concerns during the first three (3) years of her employment.

17. On or about May 23, 2022, Plaintiff was scheduled to attend a team meeting in Orlando, Florida.

18. On May 24, 2022, while in Florida, Plaintiff visited Osceola Hospital after experiencing bleeding and was diagnosed with a pending or incomplete miscarriage.

19. Plaintiff received a note from the ER physician excusing her from work until May 27, 2022, which she immediately forwarded to her manager, Lee Peck ("Mr. Peck").

20. Further, the ER physician advised that Plaintiff return to Atlanta immediately because of the hemorrhage risk and the fact that she was staying in a hotel.

21. Mr. Peck, at the direction of Vickie Hicks ("Ms. Hicks"), Senior Director of Professional Development, called Plaintiff and told her she needed to ask the hotel to refund the company for the nights she would not be staying.

22. Plaintiff told Mr. Peck that she felt this was inappropriate and insensitive since she'd provided a doctor's note and diagnosis and should have been excused from all work-related activities, particularly since a conversation with the hotel could lead to unwanted and emotionally difficult questions.

23. At that time, Nzinga Harris ("Ms. Harris"), the Senior HR Business Manager, called Plaintiff.

24.    Plaintiff told Ms. Harris that she wanted privacy regarding her health and that she felt it was inappropriate for Ms. Hicks to be directing her to work.

25.    On or around May 26, 2022, Ms. Harris instructed Ms. Hicks to send Plaintiff flowers to her home in direct opposition to Plaintiff's request that her medical condition not be shared.

26.    On or around May 31, 2022, Plaintiff visited the ER at Piedmont Hospital in Atlanta because she was still hemorrhaging.

27.    Plaintiff was given a note from Piedmont stating that she needed to be out of work until June 4, 2022.

28.    On or about June 8, 2022, Plaintiff made her first request for information regarding FMLA leave.

29.    Ms. Harris responded to Plaintiff with the next steps required for FMLA leave and/or reasonable accommodation requests.

30.    On June 21, 2022, Plaintiff tested positive for Covid.

31.    On June 24, 2022, Plaintiff informed Ms. Harris of her Covid status and apologized that it had taken a couple of days to follow-up on a previous conversation about potential unethical practices under Ms. Hicks' leadership.

32.    On or about July 5, 2022, Plaintiff submitted a note from her physician stating that her FMLA documentation was pending.

33.    Ms. Harris also emailed Plaintiff on July 5 stating that the medical documentation had to include a diagnosis and how that diagnosis impacted Plaintiff's ability to complete the essential functions of her position.

34.    Additionally, Ms. Harris stated that the note provided did not include that information and that Plaintiff had to continue to travel to meet the essential functions of her role.

35.    On July 11, 2022, Plaintiff submitted another doctor's note stating that she could not travel due to pregnancy complications.

36.    On July 12, 2022, Plaintiff received an email from HR that this second note was acceptable.

37.    HR then immediately recalled that message and Ms. Harris sent an email stating that there was an end date needed for her restriction.

38.    Ms. Harris then followed up with another email stating that the partial disability period had ended, and if that was not the case, to have her physician submit another note with an end date for the restriction and to more specifically define "no travel."

39.    On August 2, 2022, Ms. Harris sent Plaintiff another Request for Accommodation and Health Care Provider Form with 10 intrusive questions that needed to be completed by August 9, 2022.

40.    Plaintiff was concerned that this was not an official form as part of the FMLA process but rather a form that CA had developed to try and gain access to medical information they did not, by law, need to make a determination about accommodations.

41.    Several of Plaintiff's physicians told her that the level of detail required in the form was a HIPAA violation and that she did not have to complete it.

42.    However, Plaintiff wanted to be as transparent as possible and returned the form, which was completed by her primary care physician.

43.    The form included details of Plaintiff's spontaneous abortion diagnosis, abnormal vaginal bleeding diagnosis, uterine fibroid diagnosis, and a care plan including a major procedure for treatment of the fibroids scheduled for August 2022.

44.    The totality of these diagnoses in addition to Plaintiff's miscarriage fall under the scope of the PWFA.

45.    CA argues in its position statement that they do not concede that Plaintiff "demonstrated that she had a physical or mental impairment that substantially limited one or more major life activities," which is the definition of disability under the ADA.

46.    However, under the PWFA, pregnant employees must be afforded reasonable accommodations that may include the "temporary suspension of even essential job functions, which the ADA does not require."

47.    Plaintiff falls under the criteria for the PWFA, so CA's argument that the Plaintiff could not be accommodated because she could not complete essential job functions is invalid.

48.    Plaintiff's physician stated that the uterine fibroid embolization procedure ("UFE") would prevent her from all travel through September 30, 2022, and gave an end date to the no work travel restriction of October 1, 2022.

49.    There are at least six instances in this form stating that Plaintiff needed a temporary no-work travel restriction until October 1, 2022.

50.    On August 5, 2022, Plaintiff was notified by Symetra, CA's leave administrator, that her intermittent FMLA had been retroactively approved from 5/25/2022 - 7/8/2022, meaning that the information she'd provided was medically sufficient to grant her leave.

51.    On August 5, 2022, Ms. Harris initially sent an email that the form was approved and then again immediately recalled it.

52.    After Ms. Harris recalled the approval message, Ms. Harris told Plaintiff that she needed to interview her about the doctor's responses.

53.    Ms. Harris asked Plaintiff intrusive questions about whether the doctor who completed the form was actually one of Plaintiff's physicians and whether the doctor who completed the form would be performing the UFE procedure.

54.    Ms. Harris then stated the challenge that she was having was that the doctor (Plaintiff's primary care physician, who was responsible for referring her out to the numerous specialists that she was seeing) who completed the paperwork was not the actual surgeon who would perform the UFE, it didn't give them the information they needed to "substantiate the treatment plan."

55.    Plaintiff then stated again that her primary care physician, who treated and was knowledgeable on all of Plaintiff's conditions, filled out the paperwork and was qualified to do so.

56.    Notably, Ms. Harris is not a physician and, to Plaintiff's knowledge, has no medical training; therefore, she should not have the authority to override or try to interpret Plaintiff's doctor's information in a way different than what was stated on the form, much less substantiate a physician's treatment plan.

57.    Ms. Harris then tried to confuse the issue by stating that only the UFE was preventing Plaintiff from traveling and would not be occurring for 2-3 weeks, even after Plaintiff informed her that all her conditions in totality were responsible for her restrictions.

58.    Plaintiff repeatedly stated to Ms. Harris that her interpretation was not accurate.

59.    Plaintiff was very emotionally overwhelmed and stressed by this conversation because she felt that she was being intimidated, accused of being dishonest and having the medical decisions of her doctor questioned.

60.    Ms. Harris admitted that she'd already spoken to Plaintiff's doctor before the call with Plaintiff, which means she knew what the doctor's opinion was and still questioned Plaintiff about her accommodation requests.

61.    Plaintiff asked Ms. Harris if it is legal for a company to call a physician directly to ask about her treatment and stated again that she was concerned about her privacy and the level of detail CA was requesting about her care.

62.    Plaintiff pointed out that even the government issued FMLA provider certification does not ask for the level of detail that CA is requesting.

63.    In fact, the Certification of Health Care Provider form provided by the U.S. Department of Labor states explicitly that their form "asks the health care provider for the information necessary for a complete and sufficient medical certification….You may not ask the employee to provide more information that allowed under FMLA regulations."

64.    This indicates that any form CA asked to be completed with *more* detailed information than what was asked for by the DOL on the official form was illegal and constitutes interference with Plaintiff's FMLA rights.

65.    Further, Plaintiff did not understand why this level of detail was being required for her pregnancy-related conditions when, after breaking her ankle previously, she submitted a physician's note stating she could not travel that was approved with no further back-and-forth.

66.    Further, Plaintiff did not understand why, on the heels of the pandemic where people worked from home and were allowed to not travel because of anxiety over Covid, she was being informed that her request for an accommodation to temporarily not travel was creating such a business impact, particularly since CA had virtual teams and virtual shifts with customers.

67.    Ms. Harris informed Plaintiff that she needed even more details about what her doctor had provided as to why her vaginal bleeding and/or other conditions were impacting her ability to travel.

68.    Ms. Harris also stated that they need to hear from the specialist performing the UFE exactly what the recovery will entail and specific dates even though Plaintiff had already informed her that it was still in the scheduling process.

69.    Further, Ms. Harris stated that from a business perspective, that a company could not wait "indefinitely" for a procedure to be scheduled and to have a return date, which was a gross mischaracterization of what both Plaintiff and Plaintiff's primary care physician told her.

70.    Both Plaintiff and Plaintiff's primary care physician understood and informed Ms. Harris that the UFE procedure would be occurring in the next two to three weeks and she would, at best estimate, need until September 30, 2022, to recover.

71.    Ms. Harris again stated that she did not think she had the necessary information to decide on Plaintiff's no-travel accommodation, even though it had been repeatedly answered by her physician.

72.    Plaintiff repeatedly asked for written documentation about the accommodation process because she had never been provided it in writing and felt as though the rules kept shifting as well as asking for next steps.

73.    On August 16, 2022, Ms. Harris informed Plaintiff that CA was willing to grant an accommodation for Plaintiff to avoid any out-of-state travel and to conduct customer meetings in the "local area" by car.

74.    Ms. Harris followed that up with an email on August 17, 2022, where she states that Plaintiff "indicated that [she was] unable or unwilling to engage in the essential travel required to perform the responsibilities of your role…."

75. On August 19, 2022, Plaintiff replied to Ms. Harris that she had made no such indication and that she was currently fulfilling her job responsibilities and meeting or exceeding utilization requirements without travel.

76. Plaintiff also reminded Ms. Harris that in the form completed by her physician, her physician stated at least three times that "all work travel" should be restricted, even locally, due to her risk of bleeding.

77. Plaintiff also pointed out again that she had never been given a written SOP for requesting accommodations.

78. Finally, Plaintiff asked Ms. Harris to clarify what was meant by "local" travel, since Plaintiff was rightly concerned that CA may consider a two-hour drive, for example, local, but if Plaintiff began hemorrhaging two hours away from home or on the road, she could be in a medically dangerous situation.

79. Plaintiff finally decided to apply for continuous FMLA as opposed to continuing to try for a reasonable accommodation since it did not seem that CA was going to approve the accommodation request from her primary care physician, and Plaintiff did not want to continue to be asked intrusive, invasive, and potentially illegal questions about her condition.

80. On August 24, 2022, Plaintiff informed Ms. Harris that she felt as though they had reached an impasse and that she would be looking for a "next-level" review.

81.     Plaintiff then reached out to Ms. Harris' manager, Sandra O'Sullivan ("Ms. O'Sullivan"), CA's Chief People Officer, to try and schedule a meeting.

82.     However, Ms. O'Sullivan was out on vacation and Plaintiff's FMLA began the following week, so she was unable to speak to Ms. O'Sullivan at the time.

83.     On August 25, 2022, Plaintiff received a letter from Symetra approving her continuous FMLA leave for August 25, 2022 through October 7, 2022.

84.     Plaintiff returned to work as scheduled on October 7, 2022.

85.     On or about December 2, 2022, Plaintiff was terminated under the pretext of a reduction in force.

86.     CA claims that Plaintiff was terminated because of her past performance.

87.     Plaintiff believed that, instead, she had been terminated due to her complaints about the ADA and FMLA processes of CA as well as her complaints of unethical and fraudulent activity.

## COUNT I

## VIOLATION OF ADA

88.     Plaintiff incorporates by refence each and every preceding paragraph of this Complaint.

89.     Plaintiff had a disability as defined by the ADA.

90.    As detailed above, Plaintiff notified Defendant of her disability and asked for accommodations after suffering a miscarriage while on a business trip.

91.    Defendant continually demanded increasingly intrusive information about Plaintiff's condition throughout the iterative process.

92.    Despite the invasiveness of their continued questions, Plaintiff responded and had her physicians continue to demonstrate why Plaintiff could not travel.

93.    Defendant never fully approved sufficient accommodations, forcing Plaintiff to instead apply for and use a continuous FMLA leave.

94.    Defendant's actions violated the ADA.

95.    As a direct and proximate result of Defendant's intentional discrimination, Plaintiff has suffered damages, including but not limited to lost pay, job benefits, emotional distress, and all other damages allowed by law.

## COUNT II

### GENDER DISCRIMINATION IN VIOLATION OF TITLE VII

96.    Plaintiff incorporates by reference the preceding Paragraphs as if fully restated herein.

97.    As a female, Plaintiff is a member of a protected group.

98. As detailed above, after notifying Defendant of her pregnancy, Plaintiff was subjected to harassment and a hostile work environment by both her direct supervisor and HR business partner.

99. All the above conduct by was unwelcome, offensive, and intimidating to Plaintiff as well as open and obvious in the workplace.

100. Plaintiff complained that the discriminatory and harassing conduct was unwelcome.

101. Defendant willfully and wantonly disregarded Plaintiff's rights.

102. Additionally, Defendant's discrimination and retaliation against Plaintiff was undertaken in bad faith and constitutes unlawful, intentional gender discrimination in violation of Title VII.

103. As a result of Defendant's unlawful actions, Plaintiff has suffered emotional distress, inconvenience, loss of income and benefits (past and future), humiliation, and other indignities.

104. Plaintiff seeks all remedies available by law or equity.

## COUNT IV

## VIOLATION OF THE PWFA

105. Plaintiff incorporates by refence each and every preceding paragraph of this Complaint.

106.   Plaintiff had a known limitation related to, affected by, and/or arising out of pregnancy, childbirth, or related medical condition and communicated said limitation to Defendant.

107.   Plaintiff's known limitation is covered by the PWFA whether or not such condition meets the definition of disability specified in the ADA.

108.   Further, the PWFA assures that an employee shall be considered qualified for a position if any inability to perform an essential function is for a temporary period, so Plaintiff's accommodations are required to be met even if she did not meet the "essential" function of business travel for a period of approximately six (6) months.

109.   The PWFA also ensures that Plaintiff should be protected from being required to accept an accommodation other than the reasonable no-travel accommodation ordered by her physicians and accepted by Defendant's own third-party leave administrator.

110.   Forcing Plaintiff to continue to travel, even locally, or otherwise refusing her accommodation should, therefore, be disallowed.

111.  Further, Defendant cannot take adverse action against Plaintiff on account of Plaintiff's request for and use of reasonable accommodations.

112.  Defendant's actions violated the PWFA.

113. As a direct and proximate result of Defendant's intentional discrimination, Plaintiff has suffered damages, including but not limited to lost pay, job benefits, emotional distress, and all other damages allowed by law.

## COUNT IV

## FMLA

114. Plaintiff incorporates by reference each and every preceding paragraph of this Complaint.

115. Plaintiff has a serious health condition as defined by the FMLA.

116. As detailed above, Plaintiff notified Defendant of her serious health condition and asked for FMLA leave.

117. As detailed above Defendant's actions violated the FMLA in that they (1) asked her for personal medical information that interfered with Plaintiff's FMLA rights and wasn't necessary as defined by the FMLA, (2) caused a delay in Plaintiff's use of FMLA leave, (3) forced Plaintiff to work while she was out on FMLA, and in other ways as detailed above violated the FMLA.

118. As a direct and proximate result of Defendant's violation of the FMLA, Plaintiff has suffered damages, including but not limited to loss of pay and job benefits, liquidated damages, and all other damages allowed by law.

## COUNT V

## RETALIATION

119. Plaintiff hereby incorporates each and every preceding paragraph as if set forth fully herein.

120. Plaintiff engaged in protected activity under the ADA, Title VII, the FMLA, and the PWFA.

121. As detailed above and in response, Defendant retaliated against Plaintiff.

122. Specifically, Plaintiff was retaliated against when Plaintiff was (1) repeatedly asked for protected health information over what is required by law; (2) forced to take a continuous FMLA instead of being granted reasonable accommodations; and (3) terminated after her return from FMLA leave.

123. Defendant's actions constitute unlawful retaliation in violation of all the above-cited statues.

124. Defendant willfully and wantonly disregarded Plaintiff's rights and Defendant's retaliation against Plaintiff was undertaken intentionally and in bad faith.

125. As a result of Defendant's unlawful actions, Plaintiff has suffered lost compensation and other benefits of employment, significantly diminished employment opportunities, emotional distress consisting of, but not limited to,

outrage, shock, and humiliation, inconvenience, loss of income, and other indignities.

WHEREFORE, Plaintiff demands a trial by jury and for the following relief:

(a)    a declaratory judgment that Defendants have engaged in unlawful employment practices in violation of the ADA, Title VII, the FMLA and the PWFA;

(b)    an injunction prohibiting Defendants from engaging in unlawful employment practices in violation of the FMLA, ADA, Title VII, and PWFA;

(c)    full back pay from the date of Plaintiff's constructive termination, taking into account all raises to which Plaintiff would have been entitled but for her unlawful termination, and all fringe and pension benefits of employment, with prejudgment interest thereon;

(d)    front pay to compensate Plaintiff for lost future wages, benefits, and pension;

(e)    liquidated damages and compensatory damages, in an amount to be determined by the enlightened conscience of the jury, for Plaintiff's emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life and special damages;

(f)    punitive damages in an amount to be determined by the enlightened conscious of the jury to be sufficient to punish Defendants for its conduct toward Plaintiff and deter it from similar conduct in the future;

(g)   reasonable attorney's fees and costs; and

(h)   nominal damages and any other and further relief as the Court deems just and

proper.

      Respectfully submitted this 28th day of June, 2024.

*/s/ J. Stephen Mixon*
J. Stephen Mixon
Georgia Bar No. 514050
steve@mixon-law.com
Attorneys for Plaintiff

THE MIXON LAW FIRM
3344 Peachtree Rd. Suite 800
Atlanta, GA 30326
Telephone: (770) 955-0100
Facsimile: (678) 999-5039